# State of Connecticut *v.* Warren W. Strutt

## Appellate Division of the Circuit Court

File No. CR 10-21184

Argued May 15—decided June 23, 1967

*Melvin Scott,* of Groton, for the appellant (defendant).

*James J. Murphy, Jr.,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J. The defendant was found guilty in a trial to the court upon an information containing two counts. He was charged, in the first, with showing obscene movies contrary to § 53-243 of the General Statutes, and, in the second, with selling lottery tickets contrary to § 53-293. He has appealed from the judgment. Of the several assignments of error urged for reversal of the judgment, the only one we need to consider on this appeal is whether the court erred "[i]n concluding upon all the evidence [in the case] that the defendant was guilty of the crimes charged." "Upon this . . . assignment of error, we determine from the entire evidence whether the court erred in holding that guilt was established by the requisite degree of proof. It is, therefore, unnecessary to consider in detail the claims of error directed to the finding." *State* v. *Pundy,* 147 Conn. 7, 8; see *State* v. *Kohlfuss,* 152 Conn. 625, 636. The defendant has properly filed the evidence to support the assignment of error. Practice Book § 995.

There was evidence in the record from which the court could reasonably have found the following facts: Sometime prior to June 1, 1966, the defendant conceived the idea of and made plans for a stag party to be given in honor of his brother Charles's forthcoming marriage. The Goshen firehouse in the town of Waterford was selected as an appropriate site for the party. Tickets for the affair, which included beer and dinner, were printed and sold at $4 a person. To augment the income from the party and to fatten the conventional gift purse, two bottles of whiskey were to be raffled off on the occa-

sion. A ticket for the raffle was fixed at $1 a person. Approximately 95 to 100 persons paid for and attended the stag party held at the Goshen firehouse, a popular rendezvous for such events, on the evening of June 1, 1966. Many of the guests were fellow employees of the defendant, and one of them was Paul Losacano, the owner of an eight-millimeter motion picture projector. The defendant knew that Losacano owned a motion picture projector and asked him to bring it to the stag party. The defendant was in charge of and maintained supervision over the events of the evening. He acted in the role of master of ceremonies. The party was so well publicized that it came to the attention of the police. Detective MacDonald and Trooper Conroy, both members of the state police department, had no difficulty in obtaining tickets for the dinner and raffle. They were freely admitted into the firehouse premises. After a short speaking program, during which the defendant introduced to the gathering several of the guests and members of the Strutt family, the defendant announced: "We are going to have a drawing on the liquor before we show the movies to you guys . . . ." The defendant thereupon conducted the raffle of the two bottles of whiskey; these, incidentally, were won by the defendant's father and brother, respectively. After the drawing was concluded, and in language which is apparently appropriate for such occasions, the defendant said: "Okay, let's get on with the movies," whereupon Losacano, at the defendant's direction, "went to the back room and in a few minutes . . . came out with the projector and screen."

At this point in the chronology of events, the room was darkened; Losacano operated the projector and was in the process of showing one of the four films to the guests. The film was run for approximately

three minutes when, upon a prearranged signal given by Detective MacDonald, the lights were suddenly turned on and the motion picture was stopped. The police officers saw enough to be convinced that the motion picture was obscene.[1] Other state troopers, including Trooper Radgowski, who were stationed outside the firehouse, entered the premises when summoned by Detective MacDonald by means of a radio transmitter which he had concealed under his coat. After making a preliminary investigation and checking with witnesses, Trooper Radgowski placed the defendant under arrest. It was discovered that the defendant had $387 in his pockets. In the police car en route to the state police barracks at Groton, the defendant for the first time requested permission to call a lawyer. Trooper Radgowski told the defendant that he could call a lawyer as soon as they arrived at the Groton barracks; at the barracks, however, the defendant did not avail himself of the opportunity afforded him, although he was told he could make any call he wished. After advising the defendant of his basic constitutional rights, the trooper took a signed statement from him. He was booked and released from custody upon furnishing bail.

Section 53-243 of the General Statutes provides that any person "who buys, sells, advertises, lends, gives, offers or shows, or has in his possession with intent to sell, lend, give, offer or show, any book, pamphlet, paper or other thing containing obscene, indecent, or impure language, or any picture . . . of like character," shall be punished. The word "possession" is not defined by the statute. In *State* v.

---

[1] We did not view the motion picture films. At a private showing of the films at the state police barracks at Groton, the trial judge viewed three of the four films; they were found to be "filthy, dirty and obscene." On appeal before the Appellate Division, the defendant conceded that the trial court was justified in concluding that the films were obscene.

*Nathan,* 138 Conn. 485, 487, our Supreme Court said: "The mere possession of obscene motion picture films is not forbidden by the statute. Possession becomes unlawful only if the possessor intends 'to sell, lend, give, offer or show' them." In his brief and on oral argument addressed to us, the defendant insisted that the state failed to establish by the requisite quantum of proof that he was in possession of the obscene motion picture films.

In *Regina* v. *Smith,* 6 Cox Crim. Cas. 554, 556, Mr. Justice Erle said: " 'Possession' is one of the most vague of all vague terms, and shifts its meaning according to the subject-matter to which it is applied,—varying very much in its sense, as it is introduced either into civil or into criminal proceedings." See *Hancock* v. *Finch,* 126 Conn. 121, 122; *Guevara* v. *United States,* 242 F.2d 745, 747; Goodhart, "Three Cases on Possession," 3 Cambr. L.J. 195. "Few words known to the law have caused more discussion than the words 'possession' and 'custody.' " 3 Stephen, History of the Criminal Law of England, p. 124. "Indeed one of the endless controversies of 'verbal jurisprudence' is tapped by that simple question:—What is *legal possession?*" Bingham, "The Nature and Importance of Legal Possession," 13 Mich. L. Rev. 535, 536. The word "possession" has several radically different meanings. "It is found in several combinations such as de facto possession, legal possession, physical possession, actual possession, and constructive possession. Each of these combinations refers to a concept which careful writers are generally at pains to distinguish from the others." Shartel, "Meanings of Possession," 16 Minn. L. Rev. 611, 612; see Pollock & Wright, Possession in the Common Law, p. 118. "A moment's reflection must show that 'possession,' in any sense of the term, must imply, first, some actual power over the object possessed, and,

secondly, some amount of will to avail oneself of that power." Holland, Jurisprudence (13th Ed.), p. 194. "Juridical possession is generally understood to consist of two elements, namely, power over the thing possessed, including power to exclude others from interfering with it, and a corresponding will; which two elements the civilians call *corpus* and *animus*." Terry, Some Leading Principles of Anglo-American Law § 278. "To gain possession, then, a man must stand in a certain physical relation to the object and to the rest of the world, and must have a certain intent. These relations and this intent are the facts of which we are in search. . . . But, besides our power and intent as towards our fellow-men, there must be a degree of power over the object. . . . But the difference between the power over the object which is sufficient for possession, and that which is not, is clearly one of degree only, and the line may be drawn at different places at different times . . . ."[2]  Holmes, The Common Law, pp. 216, 217.

Now it is, of course, true, as contended by the defendant, that "[t]here is no evidence . . . [in the case] that the defendant had at any time physical possession of the films." But it was not essential for the state to show that the defendant had manual or physical possession of the motion picture films; it was sufficient if they were in the actual possession of a person over whom the defendant had control, so that they would be forthcoming if he ordered

[2] That the word "possession" has variant connotations is well illustrated by such cases as *Ex parte State ex rel. Harbin* v. *State,* 210 Ala. 55, *People* v. *Fox,* 24 Ill. 2d 581, *State* v. *Scott,* 333 S.W.2d 41 (Mo.), and *State* v. *Puryear,* 94 N.J. Super. 125, all cited in the defendant's brief, which we have examined. See *State* v. *Labato,* 7 N.J. 137, 148. ". . . I want to make the point that there are many meanings of the word 'possession;' that possession can only be usefully defined with reference to the purpose in hand; and that possession may have one meaning in one connection and another meaning in another." Shartel, "Meanings of Possession," 16 Minn. L. Rev. 611, 612.

them. Archbold, Pleading, Evidence and Practice in Criminal Cases (36th Ed.) § 2096, p. 776. Of course, it "must also be shown that the possession was a distinct and conscious possession on the part of the accused." 29 Am. Jur. 2d 336, Evidence, § 289.

Who, then, was the possessor of the motion picture films in the eyes of the law? "The word 'possession' denotes . . . a group of facts." Holmes, op. cit., p. 214; see Terry, op. cit. § 279. In concluding, therefore, that the defendant was in possession of the motion picture films, the court could reasonably take into account these, as well as other, factors as significant circumstances: (1) The defendant requested Losacano to bring his motion picture projector to the stag party on the evening of June 1, 1966; (2) the defendant was in charge of and had supervision over the events of the evening; (3) the defendant took on and assumed the role of master of ceremonies; (4) the defendant was aware of the character of the motion picture films which were to be shown to the gathering; (5) the defendant announced in vulgar language the showing of the films; and (6) the films were shown at the defendant's direction. Thus, there were sufficient possessory events and sufficient possessory acts pointing to defendant's connection with and relation to the motion picture films for the court to infer that he had proprietary control and continuing domination amounting to possession. *McFarland* v. *United States*, 273 F.2d 417, 419; 72 C.J.S., Possession, p. 233; Pollock & Wright, op. cit., p. 26; " 'Being in possession' is simply a state of affairs, which, in certain circumstances, involves criminal liability." Smith & Hogan, Criminal Law, p. 33.

The defendant next contends that the conviction cannot stand because he was denied his constitutional right to assistance of counsel. His reliance

upon *State* v. *Krozel,* 24 Conn. Sup. 266, 1 Conn. Cir. Ct. 549, is misplaced. In *Krozel,* the interrogation of the defendant by the police had been concluded. All the reasonable demands of the police had been satisfied. The charge against him was made out. He was placed in the lockup. At this stage in the criminal process, the defendant asked permission to use the telephone to call his own lawyer. This request was denied. He then asked permission to call his wife. This request, too, was denied. We held that harmful error had been committed "upon the facts as disclosed by the record in this case."[3] *State* v. *Krozel,* 24 Conn. Sup. 266, 275, 1 Conn. Cir. Ct. 549, 559; see *State* v. *Plourde,* 3 Conn. Cir. Ct. 465; note, 5 A.L.R.3d 1360, 1381. And in *State* v. *Corrigan,* 4 Conn. Cir. Ct. 190, 193, Judge Dearington pointed out that "since this [*Krozel*] opinion came down, the opinion in *Miranda* v. *Arizona* [384 U.S. 436] has been announced, and in it the rights of a defendant as enunciated in *Krozel* have been further extended."

The holding of *Miranda* is best summarized by the court itself (p. 444): "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural

---

[3] In *Tacoma* v. *Heater,* 67 Wash. 2d 733, a case analogous to *State* v. *Krozel,* 24 Conn. Sup. 266, 1 Conn. Cir. Ct. 549, the Supreme Court of Washington, sitting en banc, in a six to three opinion reversed the conviction and dismissed the prosecution, approving (p. 738) the rationale of *Krozel;* see *Holt* v. *Richmond,* 204 Va. 364, 373 (dissenting opinion).

safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence . . . the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." See *State* v. *Corrigan,* supra. Thus, the court has laid down simple and precise requirements which, if not observed by the police, will result in a holding that the privilege against self-incrimination was violated. In *Miranda,* both exculpatory and inculpatory statements were held privileged, and the court, in prohibiting the prosecution's use of all statements obtained in custodial interrogation, made no exception for those which did not tend to prove the defendant's guilt. Thus, *Miranda,* in effect, defined as incriminating any testimonial evidence introduced against the defendant in a criminal trial, even though the evidence was not probative of the unlawful conduct alleged. Under *Miranda,* two elements establish the existence of unlawful compulsion: the individual's ignorance of his fifth amendment rights, and the overbearing pressures of interrogation by the state. The first is to be presumed in all circumstances. The second, however, though assumed to be present in custodial interrogation conducted at the station house or after formal arrest, does not necessarily inhere in all types of police inquiry. The *Miranda* decision itself recognized (pp. 477-78) that in the case of "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process," the "compelling atmosphere inherent in the process of

in-custody interrogation is not necessarily present." In the absence of actual coercion, the police do not violate the fifth amendment by asking questions in such circumstances without warning the subject of his rights, including his right to remain silent.

And so, as in the *Corrigan* case, supra, the defendant can make no claim here that any statement of an exculpatory or inculpatory nature made by him and stemming from his custodial interrogation was introduced by the prosecution.[4] The purported statement taken from the defendant after he was effectively advised of his rights was excluded during trial; consequently, we have no occasion to consider the *Miranda* safeguards. In our view of this case, the state produced sufficient extrinsic evidence to support a finding of guilt. We find nothing in the record before us in support of the claim that the defendant's constitutional rights were in any way denied, violated or infringed.

As to the second count, the evidence is insufficient as a matter of law either to link or connect the defendant with the sale of lottery tickets. On the whole, we cannot find any basis in the evidence to

---

[4] The record is both misleading and confusing as to the status of the defendant's signed statement. The state attempted to introduce into evidence the defendant's statement. It was excluded. The court said: "At this point in the proceedings I don't think it's necessary so I'm going to exclude it. If it develops from the defense that you need those statements, that's one thing. The state has made out a prima facie case. You don't need any admissions." Later on during the trial, the court again ruled: "I am excluding the statement." And in a colloquy with defense counsel, the court remarked: "Just a moment. You have in mind that I excluded any statements that the defendant made to the officers?" When the state rested its case, the court said: "Well, I think before the state rests I think you [prosecuting attorney] ought to offer as an exhibit the statement of the defendant, which I haven't seen and won't look at, but I think it should be made part of this. It should be marked as an exhibit for identification." Whatever, therefore, may be the status of the statement, for our purposes it is out of the case.

afford support of a finding of guilty; accordingly, the conviction on the second count cannot stand. See *State* v. *Hayes,* 127 Conn. 543, 570.

There is no error as to the first count; there is error as to the second count; the case is remanded with direction to modify the judgment as to the second count and to adjudge the defendant not guilty on that count.

In this opinion PRUYN, J., concurred.[5]

[5] This appeal was argued at a session of the Appellate Division held at Meriden on May 16, 1967, before a three-judge panel consisting of *Pruyn,* presiding judge, and *Jacobs* and *Levine, Js.* After the oral argument and before the rendition of this decision, Judge Levine was elevated to the Court of Common Pleas. Counsel in the case have signed a written stipulation by the terms of which they stipulated and agreed that the case may be decided by a two-judge panel composed of Judge Pruyn and Judge Jacobs.